## A. L. FARRELL, Respondent, v. JACOB N. LARSEN, Appellant.

### No. 1468.   (73 Pac. 227.)

1. **Elections: Contests: Ballots: Preservation: Evidence: Burden of Proof.**

    Where, in an election contest, contestant desires to introduce ballots voted in evidence, the burden is on him to establish, as a condition precedent to the introduction thereof, that they have been kept in the manner prescribed by Revised Statutes 1898, sections 863, 865.

2. **Same.**

    Revised Statutes 1898, section 863, provides that judges of election, before adjournment, must deliver the package of ballots, counted and sealed as prescribed by section 858, to one of their number, who must, without having opened the package, deliver the same to the county clerk, etc. Section 865 requires that on receipt of the package the clerk must keep it unopened and unaltered for twelve months, after which, if there is no contest, he must burn the package without opening or examining the same. *Held,* that where, in an election contest for the office of county clerk, it appeared that the ballots were delivered to the contestant, who was the incumbent of the office, and that a number of the packages were unsealed, and were deliberately placed and kept in an unlocked telephone room in the clerk's office, which was unlocked, and to which unauthorized persons had unrestricted access, such ballots were inadmissible.

(Decided July 31, 1903.)

Appeal from the First District Court, Cache County.—
*Hon. Charles H. Hart,* Judge.

Action by a rival candidate to contest the election of the defendant to the office of county clerk of Cache county, Utah. From a judgment in favor of the plaintiff, the defendant appealed.

REVERSED.

*James C. Walters, Esq.,* for appellant.

There is no doubt that as a general proposition of law, the ballots are the best and primary evidence, and that the official canvass is secondary evidence. State v. Judge, 13 Ala. 805; People v. Holder, 28 Cal. 123; McCrary, Elections, secs. 291, 439; Davenport v. Olerich, 73 N. W. 603.

But this rule is changed unless the ballots are shown to have been kept in a safe manner. Dorey v. Lynn (Kan.), 3 Pac. 557.

And "if the ballots have been rigorously preserved they are the best and highest evidence; if not, they are not only the weakest, but the most dangerous." People v. Livingston, 79 N. Y. 290.

And the burden of proof is on the contestant to show that the ballots have been preserved with that care which precludes the suspicion of having been tampered with, and the opportunity of alteration or change. Hartman v. Young, 20 Pac. 17; Davenport v. Olerich, 73 N. W. 603; Fenton v. Scott, 20 Pac. 96; Rhode v. Steinmetz, 55 Pac. 614.

And before the ballots should be allowed in evidence to overturn the official count and return, it should appear affirmatively that they have been securely kept by the proper custodian of the law; that they have not been exposed to the public, or handled by unauthorized persons, and that no opportunity has been given for tampering with them. McCrary, Elections, p. 209; Cooley, Con. Limitations (5 Ed.), 78; Coglan v. Beard, 2 Pac. 737; Newton v. Newell, 6 N. W. 346; Albert v. Twohig, 53 N. W. 582; Martin v. Mills, 58 N. W. 732; Hartman v. Young, 20 Pac. 17; Powell v. Holman, 6 S. W. 705; People v. Livingston, 79 N. Y. 790; Hudson v. Solomon, 19 Kan. 177; Kingsley v. Berry, 94 Ill. 115; Caldwell v. McElvain, 56 N. E. 1012; Beall v. Alvert, 42 N. E. 166; Murphy v. Battle, 40 N. E. 470.

*P. E. Keeler, Esq.,* for respondent.

Confining the assignment, then, to the question of admissibility, counsel submits the rule to be that where it appears that there is a possibility that unauthorized persons may have had access to the ballots, it is a question of fact for the court to determine from all the circumstances whether the identity and inviolability of the same are established, and unless there is reasonable probability that they have been tampered with, the ballots are the original evidence. And even under such circumstances the ballots are admissible for what they are worth, to be considered with all the other evidence in the case. Hudson v. Solomon, 19 Kan. 177; People v. Higgins, 3 Mich. 233; People v. Cicott, 16 Mich. 283; People v. Sackett, 14 Mich. 320; People v. Livingston, 79 N. Y. 287; Tebbe v. Smith, 41 Pac. 454; Hughes v. Holman, 32 Pac. 298; Hawser v. Pepper, 79 N. W. 1018; Hartman v. Young, 20 Pac. 17; Metzer v. Davis, 80 N. W. 557; Catron v. Craw, 46 N. E. 3; Ferguson v. Henry, 64 N. W. 292; Apple v. Barcroft, 41 N. E. 1116; Sone v. Williams, 32 S. W. 1016; Mallett v. Plumb, 22 Atl. 772; O'Gorman v. Richter, 16 N. W. 416.

BARTCH, J.—The plaintiff, who was a rival candidate, brought this action to contest the election of the defendant to the office of county clerk of Cache county, Utah. The contestant alleged that the board of canvassers, at the election held November 4, 1902, returned 3,060 votes for him and 3,066 votes for the contestee; that a certificate of election was issued to the contestee; that in all of the districts of the county legal votes for the contestant were rejected, and illegal votes counted for the contestee; that ballots improperly marked, and bearing marks of identification, were counted for the contestee; and that, if all the illegal votes cast for the contestee were deducted from the total vote, the number of votes received by the contestee would be less than the number received by the contestant. At the trial,

over the objection of the contestee that they "had not been sufficiently shown to have been preserved from interference," the ballots were admitted in evidence, and upon a recanvass of them in certain districts the court found that the contestant had received, of the legal votes cast, 3,034, and the contestee 3,023, and ordered the contestant to be declared elected, and the certificate of election of the contestee to be cancelled and annulled. Judgment was entered accordingly.

The contestee now challenges the correctness of the judgment and decree by appeal, and insists, *inter alia,* that the court erred in admitting the ballots in evidence, and ordering them to be recounted in certain districts, where the contestant alleged illegal ballots had been counted by the board of canvassers. It is urged that, after the votes were counted, and the official returns and canvass made, the ballots were not kept and preserved as required by law. The statute concerning elections, in section 858, Revised Statutes 1898, on the subject of the disposal of ballots after counting by the judges of election, provides: "At all elections, the ballots as soon as read must be strung on a string by one of the judges, and must not thereafter be examined by any person. The 'excess' and 'defective' ballots, separately strung, shall, with the counted ballots, be carefully sealed in a strong envelope. Every 'excess' or 'defective' ballot must be marked by the judges, in writing, across the face thereof, 'Excluded on the ground of . . . ,' filling the blank with a brief statement of the reasons for the rejection, which statement must be dated and signed by the judges." Section 863 provides that the judges, before they adjourn, must deliver the package of ballots so counted and sealed to one of their number, who must, within 24 hours, deliver it, "without their having been opened to the county clerk, city recorder, or town clerk, as the case may be." Section 865 provides that upon the receipt of such package the clerk or recorder must file the same, and "must keep it unopened and unaltered for twelve months, after which time, if there

is not a contest commenced in some tribunal having jurisdiction, he must burn the package without opening or examining the contents.'' These provisions of the statute, as will be seen, specify particularly how the ballots, after they have been read and counted by the judges of election, shall be sealed, to whom they shall be delivered, how and for what length of time and purpose, and in what manner finally destroyed. The statute prescribes the manner of the preservation with much strictness, and every consideration of public policy requires that its terms should be complied with as near as possible and practicable. The evident intent of the Legislature was to have the ballots, for the purposes of a contest, preserved untouched, undisturbed, and inviolate; and such intent is in harmony with the best interests of the State and its subjects. When preserved, as required by the statute, the ballots, under well-settled law, are the best and controlling evidence, in an election contest, to determine who is entitled to the particular office in controversy, and may be received to overturn the presumption that the returns are correct, and that the election officers performed their duty. The correctness of the official canvass and returns is presumed, since the same are made immediately upon the close of the polls, by sworn officers, usually in the presence of the friends of the competing candidates, before the result of the election is known, or an opportunity for tampering with the ballots is presented. Such being the case, the *onus probandi*, in all election contests, is upon the contestant, who offers and relies upon such evidence, to show that the ballots have been kept and preserved according to the requirements of the statute; and before the ballots can be received in evidence it must affirmatively appear from the testimony that they have been so preserved. The well-known rules of evidence, as well as public policy, require that he who relies upon such evidence should satisfactorily show that the ballots have been preserved according to law, and are genuine. When they have been so preserved, then, as between

Farrell v. Larsen.

the returns and the ballots, the ballots must control. Experience has shown that temptation on the part of a defeated candidate or his friends to change the result of an election has been frequently manifest, especially where the vote was very close. In such case the danger of tampering with the ballots is so great that no opportunity must be afforded by those who are entrusted, under the law, with their safe-keeping. Therefore, in cases where the departure on the part of the custodian of the ballots from the statutory requirements for their preservation has been such as to necessarily expose them to unauthorized persons or the public, the ballots should not be received as evidence against the correctness of the official count and returns. The rule that the ballots must be kept and preserved in accordance with the requirements of the statute, to continue them as controlling evidence in an election contest, and that the burden is upon the contestant to prove that they were not improperly or unlawfully exposed, but were preserved and undisturbed, is doubtless in harmony with the great weight of authority.

In McCrary on Elections, sec. 471, the author says: "Where, as is the case in several of the States, the statute provides a mode of preserving the identical ballots cast at an election for the purpose of being used as evidence in case of contest, such statute, and particularly those provisions which provide for the safe-keeping of such ballots, must be followed with great care. The danger that the ballots may be tampered with after the count is made known, especially if the vote is very close, is so great that no opportunity for such tampering can be permitted. Such ballots, in order to be received in evidence, must have remained in the custody of the proper officers of the law from the time of the original count until they are produced before the proper court or officer; and if it appear that they have been handled by unauthorized persons, or that they have been left in an exposed and improper place, they cannot be offered to overcome the official count."

Respecting the admissibility of ballots in evidence in an election contest, Judge Cooley, in his Constitutional Limitations, p. 788, says: "But back of this prima facie case the courts may go, and the determination of the state board may be corrected by those of the district boards, and the latter by the ballots themselves, when the ballots are still in existence, and have been kept as required by law. If, however, the ballots have not been kept as required by law, and surrounded by such securities as the law has prescribed with a view of their safe preservation as the best evidence of the election, it would seem that they should not be received in evidence at all, or, if received, that it should be left to the jury to determine, upon all the circumstances of the case, whether they constitute more reliable evidence than the inspector's certificate, which is usually prepared immediately on the close of the election, and upon actual count of the ballots as then made by the officers whose duty it is to do so."

The Court of Appeals of New York, in People v. Livingston, 79 N. Y. 279, held that the trial court erred in charging the jury that, to justify the rejection of the ballots as proof, it must appear affirmatively by direct evidence or from circumstances that the ballot boxes had been interfered with and a fraud committed. Mr. Chief Justice Church, speaking for the court, in part said: "The error is in putting upon the party against whom the ballot boxes are introduced the onus of proving that they had in fact been tampered with. The statute requires the ballot boxes to be preserved undisturbed and inviolate, and it is incumbent upon the party offering the evidence to show that they had been so kept; not beyond a mere possibility of interference, but that they were intact to the satisfaction of the jury. The burden was upon the relator to satisfy the jury that the boxes had remained inviolate. The returns are the primary evidence of the result of an election. They are made immediately upon canvassing the votes, and the

26 Utah 19

votes are canvassed at the close of the polls in public, and presumably in the presence of the friends of both parties. . . . They may be impeached for fraud or mistake, but in attempting to remedy one evil we should be cautious not to open the door to another and far greater evil. After the election it is known just how many votes are required to change the result. The ballots themselves can not be identified; they have no earmark. Everything depends upon keeping the ballot boxes secure, and the difficulty of doing this for several months in the face of temptation and opportunity requires that the utmost scrutiny and care should be exercised in receiving the evidence. . . . Every consideration of public policy, as well as the ordinary rules of evidence, require that the party offering this evidence should establish the fact that the ballots are genuine. It is not sufficient that a mere probability of security is proved, but the fact must be shown with a reasonable degree of certainty. If the boxes have been rigorously preserved, the ballots are the best and highest evidence, but, if not, they are not only the weakest, but the most dangerous, evidence.''

Mr. Justice Brewer, in Hudson v. Solomon, 19 Kan. 177, said: ''In order to continue the ballots controlling as evidence, it must appear that they have been preserved in the manner and by the officers prescribed in the statute, and that while in such custody they have not been so exposed to the reach of unauthorized persons as to afford a reasonable probability of their having been changed or tampered with.''

In Jeter v. Headley, 186 Ill. 34, 57 N. E. 784, Mr. Justice Wilkins, delivering the opinion of the court, said: ''While the right to have the ballots so kept, and recounted upon a contest, is a most important right, frequently guarding a candidate against willful or negligent false returns, yet it can readily be seen that to allow a recanvass of the votes cast at an election to destroy the effect of the returns by the judges and clerks when regularly made, and without proof of omission of duty,

negligence, fraud, or other misconduct on their part, in the absence of the most clear and convincing proof that they have been so kept as to preclude all idea of their having been changed, would be most unjust, not only to those officers, but to candidates shown to have been elected by their returns.'' McCrary on Elections, secs. 472-481; Caldwell v. McElvain, 184 Ill. 552, 56 N. E. 1012; Coglan v. Beard, 65 Cal. 58, 2 Pac. 737; Davenport v. Olerich, 104 Iowa 194, 73 N. W. 603; Beall v. Albert, 159 Ill. 127, 42 N. E. 166; Powell v. Holman, 50 Ark. 85, 6 S. W. 505; Hartman v. Young, 17 Or. 150, 20 Pac. 17, 2 L. R. A. 596, 11 Am. St. Rep. 787; Bonney v. Finch (Ill.), 54 N. E. 318; Kingery v. Berry, 94 Ill. 515; Rhode v. Steinmetz, 25 Colo. 308, 55 Pac. 814; Newton v. Newell, 26 Minn. 529, 6 N. W. 346; Albert v. Twohig, 35 Neb. 563, 53 N. W. 582; Martin v. Miles (Neb.), 58 N. W. 732; Fishback v. Bramel (Wyo.), 44 Pac. 840; People v. Burden, 45 Cal. 241; Fenton v. Scott, 17 Or. 189, 20 Pac. 95. 11 Am. St. Rep. 801.

Looking now at the facts disclosed by the record in the case before us in the light of the principles above referred to, the question is, were the ballots kept and preserved according to law up to the time they were admitted in evidence? It appears that the contestant himself was the custodian, and that the packages containing the ballots were received by him, as county clerk, on the next day after the election, and remained in his possession until the time of the trial. From his own testimony it appears that while in his possession one package was opened in the presence of the board and candidates, to get at the records, and then again sealed; that the sheriff took out two packages whereon the seals were so frail that they broke open; that otherwise the ballots were, so far as he knew, in the same condition as they were when he received them; that on the packages from several districts the seals were broken, while the ballots of one district were not sealed at all, but simply wrapped in an envelope, and not tied; and that in this condition the packages

were placed and kept in a telephone room, which was in the contestant's office, although there was a vault connected with the office having some vacant space therein. Respecting the telephone room, and the access to the ballots therein, the contestant testified: "There is a lock on this telephone room, but it has not been locked. The door of the main office, where the telephone room lies, is always open when the janitor is around. With the arrangements I have made, it will be easily possible for persons not in my employ to have access to these envelopes in a way, but to what extent I would not be willing to say. It would be easily possible with the arrangements which I have made. I have never examined the packages containing the ballots after they were placed in the telephone room. I have never kept track, from time to time, that they were there. It would have been possible, if any one desired to do so, that some of them might have been taken out and kept over night and over a day, and then returned, and I would have never been the wiser. . . . Since election day I have known of times when the office was left vacant without any person in charge of the inner or outer office." He further testified: "The janitor has access to both offices. The door between the two offices is always unlocked, so far as I know. The door of this telephone room, after the official count was made, was always unlocked. There are times when the outside door of my office is also unlocked—for instance, at the time the janitor makes the necessary cleaning, building fires, and other such work." It also appears that the clerk, the deputy clerk, the assistant, and the janitor all had keys to the office. Further reference to the evidence in detail would be unimportant. The careless and reckless manner in which the ballots were kept is so manifest from a perusal of the testimony as to leave no room for argument. That the letter and spirit of the statute were alike violated is clear beyond all reasonable controversy. For the contestant himself to undertake to be the custodian was, to say the least, of doubtful propriety; but

when it is considered that while in his custody the packages, a number of them in an unsealed condition, were deliberately placed and kept in a telephone room, unlocked, and to which unauthorized persons had unrestricted access, the transaction becomes so fraught with suspicion as to render the ballots wholly inadmissible as evidence in a court of justice. If such ballots, so preserved, could, in an election contest, be employed to rebut and overturn the strong presumption that the election officers properly performed their sworn duty in making their official count and returns, then, indeed, the door to fraud and corruption would be wide open. The security of the ballot, after being cast, is, for the purposes of a contest, quite as important as freedom and independence in casting it; and where, as in this case, the contestant is himself the custodian, not only the law, but every consideration of justice and fairness, requires that the strictest care and vigilance be exercised in the preservation of the ballots, so as to preclude even the suspicion that they may have been tampered with by unauthorized persons. Where they are so carelessly preserved as in this instance, who can say that the very distinguishing marks complained of were not placed upon the ballots after the official count? Who can say, with any degree of assurance, that ballots so kept have remained unopened, unaltered, and inviolate? The will of the people cannot thus be put in jeopardy. Ballots thus kept and preserved must be held to be incompetent and inadmissible as evidence to change the official count and returns of an election within this jurisdiction.

Having reached this conclusion, it becomes unnecessary to decide any of the other questions presented. The judgment must, therefore, be reversed, with costs, and the cause remanded, with directions to the court below to dismiss the action.

It is so ordered.

BASKIN, C. J., and McCARTY, J., concur.